## Elijah Nicks v. The State.

### No. 2877. Decided February 24, 1904.

**1.—Evidence—Statement of Deceased Witness.**

A statement of a witness who had died since the commission of the homicide, purporting to have been made in the presence and hearing of defendant, but to which statement the latter did not assent to make it his own, although he did not object to same, is not admissible against him on the trial for said homicide; even had said witness testified to the facts and had since died, unless by defendant's silence he made it his own.

**2.—Same—Contradiction.**

An unsworn statement of a witness who had died since the commission of the homicide, purporting to have been made in the presence and hearing of the defendant, but to which the latter did not agree, although he did not expressly object thereto, is not admissible against him to contradict him on the trial for said homicide.

**3.—Bill of Exceptions—Statement Under Arrest.**

Unless the bill of exception shows as a fact that appellant was under arrest at the time and had not been properly warned, and this is merely raised by an objection, the ruling of the court will not be reviewed, especially where the court states that appellant was properly warned, and a statement made by appellant although not exactly contemporaneous in point of time with such warning is admissible.

**4.—Same—Impeachment.**

The appellant could not show on cross-examination of a witness, that certain of the relatives of the deceased had attempted to bribe witness to poison the wife of deceased to prevent her giving testimony in the case, unless said relatives had been placed on the stand against appellant, and such evidence could have been used to impeach them.

**5.—Charge of the Court Criticised.**

The use of the word "reasonably" would have been better than the word "actually" in a charge on the issue of self-defense, which instructed the jury that the appellant must have actually believed a certain state of facts.

**6.—Same—Perfect and Imperfect Right of Self-Defense.**

The court should have given a clear charge, setting forth the theories, as to whether defendant had a perfect or only an inperfect right of self-defense, where the evidence raised the issue whether he called on the wife of the deceased for a lawful or an unlawful purpose and there provoked an assault upon himself by the deceased.

Vol. 46 Crim.—16.

**7.—Same—Manslaughter—Imperfect Right of Self-Defense.**

If the evidence raised the issue of imperfect self-defense, and that appellant went to the house of the deceased to seek a clandestine meeting with the latter's wife, it would be the duty of the court to charge on manslaughter.

Appeal from the Criminal District Court of Galveston. Tried below before Hon. J. K. P. Gillaspie.

Appeal from a conviction of murder in the second degree; penalty, forty years imprisonment in the penitentiary.

The following statement of the case as taken from appellant's brief is substantially correct:

H. M. Brown, for State, testified that he was a police officer in the city of Galveston, on February 28, 1903, on which day he saw Vincent Guzzi in yard of Guzzi's corner grocery on northeast corner of Eighth and Market streets, where Guzzi was dead; that adjoining the grocery is a stable with a door leading from the west, which goes right through into yard of deceased. Adjoining on the other side of the wall is another door, and that when he went in there deceased was lying on his back with his head north or northeast, with his feet toward the door; his hat under his head. Witness found a pistol on his right side, between his hand and his side, lying right by his side. Witness picked the pistol up and turned it over to Officer John Bowe. On the body of deceased witness found one wound about two inches to the right of the navel; one right in the center of the breast; one through his left arm, entering his body under pit of his arm; one through his left cheek; his chin was all powder-burned, the sleeve of his left arm was all powder-burned; the sleeve had all been burned away; deceased was in shirt sleeves and had vest on. With witness, Officer Burke was on the corner of Thirteenth and Winnie at 10:25 p. m., before the shooting; the wind was blowing from the northeast, and witness heard a loud report; witness was some seven or eight blocks from where the body was found; it took about ten minutes to get to the body. Right after the report from the heavy gun witness says he heard a report like from a small gun—a sharp report, and then there were four or five in quick succession—six in quick succession, the witness thought. Witness ran until he got to neighborhood of grocery store and got there just about the time the patrol wagon did, and when he got there went in and found the body as stated. The pistol found was a five-shooter, 38 caliber, an old make.

Mrs. Jesse Robinson, for State, testified that she lives just across the street from Guzzi's—on the opposite corner, and knew him; was at home on the night of the shooting; saw Guzzi after he was shot; his body was in the stable between the store and the yard; he was dead; heard the report of the pistol; shortly afterwards saw a man run out of the stable door and run east from there.

M. H. Royston, third witness for State, testified that he was judge of the corporation court, in Galveston, March 2, 1903; that he saw defend-

ant on morning of said day; defendant was then under arrest; that he warned the defendant as to any statement he might make. (Here the jury was withdrawn, at request of defendant, and witness was questioned as to extent of said warning as to statements made by defendant. Witness stated that he had warned defendant in the early morning, but that defendant did not make any statement until in the afternoon, after dinner, and that defendant was not warned but once, and was not warned again in the afternoon; that witness stayed around police station all day, back and forth, for the purpose of getting defendant to make a statement, and the witness proceeded to relate the statement made by defendant. Defendant objected to the admission of defendant's statements as evidence against him, on ground that warning in the morning was remote, and that statements of defendant were coaxed and cajoled from him, and that defendant did not have any warning as to use of statements at time same were made, and that statements were not voluntary. The court overruled defendant's objections, to which he excepted, and the jury were brought back and heard witness Royston proceed.) Mr. Royston, continuing, said defendant stated that he had shot Guzzi; that on the night of the shooting, Saturday night, defendant also had asked one Tom Ward if he could send Jesse Garcia over to the mill where Ward was engaged as watchman. The statement of defendant was reduced to writing; the statement was handed witness, who identified it, but said it was not all included in that—there were other details. The defendant told witness that he sent Jesse over to Ward's place at the rice mill to get some cartridges, and that later Ward telephoned him; that he walked over there to see Ward; that he had some conversation with Ward, and then went up to Guzzi's house; that the stable door was open there as he thought it would be, and he went in; that he was in the stable door leading from the street and that Guzzi came down the steps with a pistol in his hand; that Mrs. Guzzi was down in the yard; that Guzzi began shooting at him, and he shot at Guzzi; that Guzzi fell and he shot down at him; that he ran out through the back door and went back to the mill; that he didn't see anybody around there, and went in to where there was a faucet and washed something out of his face; that he was stooping over when Tom Ward came, and he talked with Ward, and told him that the fellow he was looking for had not showed up, and that he had walked out to the beach and fired his pistol; then he asked Ward to take his pistol and clean it for him, which Ward did; he asked Ward if Jesse was there, and to tell Jesse to come down, he wanted to speak to him; that he was there a few minutes and then went over and went to bed, and the next morning he and Ward got up a party to go down the island shooting; that he carried his pistol along and they shot at targets. That he then came home, and that when he came home on Sunday the police told him they wanted him, and they took him up to the police station. Witness Royston further stated that when he first warned de-

fendant in the morning, defendant said he had nothing to do with the killing; that one Tom Ward and the Mexican Jesse knew he was at the rice mill that night; that witness then asked defendant if he wanted to hear what Ward and Jesse had said about it (Ward and Jesse were also under arrest in another apartment at police station), and defendant said yes, and witness confronted defendant with the two men named, and then asked the defendant if the men, Tom Ward and the man Jesse, were the ones defendant had spoken of, and defendant said yes; witness then told Ward and Jesse to repeat the statements they had previously made to him, Judge Royston, and both witnesses said in defendant's presence substantially that they saw defendant the night of the homicide.

(Defendant here objected to the witness Royston testifying to what had been told him by Ward and Jesse, on ground same was hearsay and inadmissible; court overruled objection, and defendant excepted.)

Witness Royston then proceeded to tell the jury what Ward and Jesse had said about defendant's connection with the homicide; that defendant had sent to the rice mill for some cartridges; that he was going to lay for a man who had been hanging around his premises; that later they saw defendant step from behind a brush with his face blackened with burnt cork; that later they saw defendant washing his face at a basin; that defendant told them he did not find the man, but had gone to the beach and fired his pistol, and told them to prove an alibi for him if they were questioned. Witness Royston stated that defendant had agreed to the statements made in his presence by Ward and Jesse, except that defendant denied that his face was blackened with cork; denied that he had blackened his own face; said he had tied a green handkerchief over his eyes after shooting, but did not have anything on his face before the shooting; that his face was powder burned after shooting. Witness Royston stated that the man Ward was dead; had never testified in court; that as assistant district attorney he had had process issued to produce the man Jesse Garcia as a witness, but could not find him, but the State announced ready for trial without him. (Note.—The court did not exclude any of the statement repeated as having been told by Ward, the dead witness, and Jesse, who was not in court and did not testify as a witness, even when Witness Royston said defendant had in the presence of Ward at said time denied said statements and said they were untrue.)

On cross-examination witness Royston said he examined defendant's face on the Monday these statements were made after the shooting two nights before, and that defendant's face was powder-burned in at least twenty places, and that there was a bruised contusion on defendant's ear; that defendant's pistol was a 38-caliber; that on the morning witness referred to, defendant told witness that he had been telephoned for to go to the Guzzi place that night; and that defendant told witness that some lady had telephoned him to come there; that when he got to the Guzzi

place the back gate or door was open; and that he had gone through that door into the yard; that just after he got inside the yard the deceased commenced to fire at him, and he fired back; defendant told witness that Mrs. Guzzi telephoned him.

Mrs. Tom Ward, for State, testified that her husband, Tom Ward, was dead; that on February 28, 1903, he was alive and was employed at rice mill; that since that time Tom Ward had been killed in a railroad accident.

Mrs. Vincent Guzzi, for State, testified that she was the wife of deceased; that on night of shooting she was up stairs, and heard the report of a pistol; that previous to firing of pistol, her husband went down stairs; was caused to go down by some one saying the horse was out. She went to bed early that night, and her husband came up stairs to go to bed and some one said the horse was out; and he went to window and looked out; then took witness' pistol from under her bed and went out; and after he went down witness heard shot of gun; didn't know how many shots were fired; went to window and called to neighbors; and all went out in the yard and found Mr. Guzzi there; did not hear anything after the pistols were fired; did not hear voice of any one; the pistol belonged to witness; witness heard the voice that said the horse was out, once or twice; could not say where the voice came from; could not tell anything about the voice. On cross-examination, the witness said: "When I heard the voice say the horse was out, my husband went down stairs into the yard. The horse had been out before. On this night my husband took my pistol with him when he went down stairs. My husband had never taken a pistol with him before when the horse was out. I know the defendant Nicks, and have known him since some time last summer, when he was working on the street cars. Our house is on Eighth and Market streets, directly in front of St. Mary's Infirmary. The end of the street car line is also there. I got acquainted with Nicks by his coming in the store like other street car men did to get cigars and beer and lunch. Mr. Nicks came in the store one day when Mr. Guzzi was quarreling with me, and Mr. Guzzi started to hit me, and Mr. Nicks said for Mr. Guzzi not to hit me; if he did he would have him arrested; and after that time Mr. Guzzi said he was going to kill Nicks. I afterwards told Nicks about it, and afterwards I had trouble with my husband and was going to get a divorce from my husband, and I had to have witnesses because Mr. Guzzi struck me, and I went down to see Mr. Nicks, and asked him if he would be a witness for me, and he said no; he would have nothing to do with the suit. I had already filed my suit for divorce. It was in September I went to see Nicks, at which time he was then running a wood yard. I had separated from my husband at the time I went to see Nicks at the wood yard. I told Nicks before this that my husband had threatened to kill him. I afterwards went back to my husband. The 28th day of February was Saturday. On Friday before, Mr. Guzzi had gone down town, and he came home, and com-

menced abusing me and fussing and quarreling, and he continued to fuss and quarrel all night; and the next morning he says to me, 'I am going down town, and something is going to happen today,' and that night when he came back he says, 'I will bet I will kill Nicks before Sunday.' He went down town and came back, and fussed and quarreled around there all day; he fussed about Nicks interfering with him hitting me that time, and he said he was going to kill him for it; this was on Saturday. I did not at any time when Guzzi quarreled with me telephone Nicks to come over to my house. I don't know whether my husband did or not." On further direct examination, the witness said: "I separated from my husband because Mr. Guzzi hit me. I went and had the conversation with Nicks when I went to get my divorce, because I had to have witnesses, and I went to him; it was in September I went to see Nicks. My husband was killed in February. I heard some one groan after the first shot was fired; don't know who it was; could not say who it was. When my husband got up to go down stairs I was at the front window. I went to the window when some one said the horse was out, and I stayed at the window and saw my husband go through and do down to get the horse. I heard somebody calling, and thought at first it was a neighbor calling to use the telephone to telephone for a doctor. I didn't know just where the voice was. I supposed the party was out there somewhere."

Dan J. Curtin, for State (a paper was handed witness): "This is my signature. I know the defendant, Nicks. The paper is the statement that Nicks made. I wrote out the statement and Nicks signed it in my presence, and in the presence of the chief of police."

The statement referred to by witness Curtin is in substance as follows: That defendant was running a wood yard on February 28, 1903; that about 1 p. m. of said day Mrs. Guzzi telephoned him, begging him to come to her house that night; that he went, and on arriving there went to the stable door, which had been left unlatched by Mrs. Guzzi, and entered into the yard; in a moment or two Guzzi came out, pistol in hand, and began shooting at defendant at close range, powder-burning his face; defendant wheeled and run and fired four shots at Guzzi; that Mrs. Guzzi was an eyewitness to the shooting; that Guzzi's horse at said time was standing in the middle of the street; that defendant then left, and ran to his home, where he went to his room to see how badly he was injured; then went to the rice mill, where he left his pistol, a 38-caliber; that Ward's statement as to his blackened face was not true, but that he had a green handkerchief tied on his face; that deceased, Guzzi, had before this threatened to kill him if he caught him in the eastern portion of the city; and had later told defendant that he, Guzzi, ought to have done away with him long ago; that while Mrs. Guzzi was phoning him she had asked what her husband had said to him. The statement is

signed Elijah Nicks, with J. T. Rowan's name and D. J. Curtin's name as witnesses.

Mrs. Louis Davis, for State, testified that she lived across the street from home of deceased; heard shots the night of the homicide, and heard Mrs. Guzzi screaming before the officers got there; did not hear any voice calling.

Ben Outz, for State, testified that he lived on same street of deceased, about forty feet away; witness was sitting on edge of his bed smoking, the night of the shooting, and heard some one say, "Mr. Guzzi, your horse is out;" didn't know whose voice it was, whether of Guzzi's servants or not; heard the voice call once or twice; then shortly heard shots fired, didn't know how many shots, there was so much shooting going on all at once; didn't know who did the shooting; didn't see anyone.

Dave Schram, manager of Racket store in Galveston, first witness for defendant, testified that defendant bore a good reputation for peace and as a law-abiding man.

Dolf Rogers, foreman Galveston City Railroad, testified to same facts as prior witness, Schram.

Mrs. Vincent Guzzi, State's witness, recalled by defendant, testified as follows: "The house occupied by myself and husband had three rooms down stairs and two up stairs. In one of the rooms down stairs we sold beer; then another large room and a store room. My bed room was up stairs. My husband was an Italian; I am an American. We had but one servant, Leonardo Rilli, employed at said time. I do not know where said servant was that night. I heard the voice which said, 'Your horse is out.' I could not tell whether it was the voice of a man or woman. At said time I was up stairs in my bedroom. I knew the defendant Nicks, and knew him well enough to know his voice when I heard it. It was not Nicks' voice that called out, 'Your horse is out.' Leonardi Rilli had been employed by my husband some years, and lived across the street. I do not know who opened the little door or gate to the little shed or stable that let the horse out. I do not know that the voice which called to some one that the horse was out was the voice of Leonardi Rilli." On cross-examination, witness said: "I was present on the examination in this case before. I have not talked with any one about this case; no one has been out to see me about it. I was very much excited on the night my husband was killed. I recollect that much, that the voice did not sound like Nicks' voice. I did not open that door that night and let Nicks in. I went to bed about 7:30 that evening and Mr. Guzzi called me down to take clothes in, and I went down in the yard and we took the clothes down, which was a little before the shooting. I don't know where the horse was when we took the clothes down. Never noticed whether the gate was open or shut at said time. Mr. Guzzi took that little pistol of mine when he went down stairs. * * * I could not state why Mr. Guzzi did not take his own pistol; he was in my room, standing close to the window, and he just put his hand under

my pillow that was close to the window and took out the pistol. Mr. Guzzi and I did not sleep in the same bed; we slept in the same room. but in different beds. Instead of getting his own pistol, he reached under my pillow and took my pistol. I heard someone groan after the first shot; don't know who it was. I did not say on the first trial that I heard my husband groan; I said I heard some one groan, and thought it must be my husband, seeing that he was dead. Don't know whether he was dead when he groaned or not. Mr. Guzzi had his pistol for two or three years; it was loaded. When the officers came to the house looking for arms, it was there. I did not make a written statement about this case. I did make a statement to Mr. Royston, the coroner; I spoke to Mr. Royston about it down at the city hall. He wrote me a note asking me to come down there and I went there. I did not talk to Nicks that morning, but did next morning. I told Mr. Royston that I heard someone groan after the first shot, and thought it was my husband, being that he was dead, but didn't know who groaned. The voice of this servant of Guzzi that I had been asked about—he speaks Italian. He can't talk English much. I don't pretend to tell the jury I couldn't tell his voice from an American's; I could tell his voice from anybody else's. I don't know whether I heard his voice there or not. He does speak some English. * * * They never let me read that paper. I knew they were investigating my husband's death. I knew they were officers of the law trying to find out who had killed my husband. They frightened me half to death; I didn't know what I was doing, but I am here on the stand to tell the truth. Those Italian folks have threatened to kill me, and I was afraid to tell the truth, but I am here to tell the truth now. They did threaten to kill me that morning. Some of them threatened to kill me * * * don't remember who, but I have a witness to it. They told Leonardo they would pay him money to kill me. None of the police officers threatened to kill me, but they treated me dirty. I was the wife of the dead man; they were officers of the law. One officer dragged me out of the car like I was a dog. They did not accuse me of being connected with the killing. Mr. Royston treated me kindly. I did send for Mr. Royston. I have not been sending provisions to the jail to defendant. I did not send any dinner to any one. I never sent anything to the jail there since the defendant has been there, nor have I sent them to a young man in Mr. Johnson's office, nor to the defendant, at no time. The pistol shown me looks like the pistol my husband had that night. The pistol shown me was under Mr. Guzzi's pillow, at the head of his bed; and this pistol is the one that was under my pillow." On further direct examination, witness said: "The statement was not read over to me before I signed it. The next morning after my husband's death they sent for me to come down to the police station. The officers did threaten me when I was at the police station about this statement; they told me there was a man with boots and they told me that he was going to put me in jail, which frightened me and I didn't know

what to do; I was called on to make a statement, and they wrote something down, I don't know what. I never read it, and they never read it to me. I have never been to the police station before, and was not familiar with the practice at the police station."

Elijah Nicks, defendant, sworn in his own behalf, testified: "I have been living in Galveston nearly six years. In May, June and April of 1902 I was employed by the city railroad as a street car conductor, and one time I was on the Market street line. Vincent Guzzi lived on the corner of Eighth and Market streets, and our line ran between Guzzi's store and St. Mary's Infirmary. I was running on the car line and as a general rule all the boys would go in and get a beer and sandwich at the Guzzi place, as it was the end of the line there, and we sometimes stopped there from two to five minutes before we made the return trip. I do. not remember how many times I had been in said store before I got acquainted with Mrs. Guzzi, but I was in there quite often. I was there at one time when Mr. Guzzi made an assault upon his wife. * * * In May, June or July I was in there and I met Mr. Guzzi and Mrs. Guzzi, and I heard him calling her all sorts of names when I went in, and he ran up to her to strike her, and he did hit, and started to hit her again, and I asked him as a friend of Mrs. Guzzi's. not to strike her.. I said that is not right; don't hit the lady in that way. I told him also if he didn't cut it out, I would have him arrested. Before that he seemed to be a friend to me, and treated me nice. After I made said statement to Guzzi I only remained in the store a short time—I went back to the car in a minute or so. Some time after that I went in' the store and got some beer and sandwiches with the boys again. I was informed afterwards of threats made by Guzzi against me. I had been informed to be on the lookout, at any time; that Guzzi had threatened to kill me the first chance he got. After I quit working for the street car company I bought a wood yard. Mrs. Guzzi came out to see me at the wood yard one time. The day she came out there she said her husband and herself had separated, and she was going to try to get a divorce from him; that he had been treating her mean all along. She said that I had seen Guzzi hit her, and asked me if I would be a witness in her divorce case; I told her no; please not get me involved in the affairs between her and him; I didn't want to have anything to do with the Italian at all, and I didn't want her to have me brought up to court to have anything to do with their affairs. Mrs. Guzzi told me after that that Guzzi said he was going to kill me the first chance he got, and for me to be on the lookout and be prepared for it. About three weeks before the shooting I saw Guzzi himself; I met him on Seventeenth and Market streets, I believe it was. I was going west and he was going east. Guzzi asked me what I was doing up there. I told him I was collecting for wood I had sold around there, and was attending to my business. 'Well,' he says, 'if I catch you out here any more I will kill you.' I said, 'Go ahead and do it now; I have not even got a pocket knife to protect myself with.' So he said.

as he drove off in a wagon, 'I ought to have done away with you long ago.' I had nothing to protect myself with, so I did not resent it, and went on away. So after that time I thought I ought to be on the look-out for him, as things were getting pretty warm. I studied over the matter. Tom Ward had a gun for sale and I bought it. * * * I don't remember just how long this was before the shooting, but somewhere around three weeks. It was after Guzzi attacked me on Seventeenth and Market. On the 28th of February, which was Saturday, I believe, I had up steam in my boiler and was busy sawing wood all through the day up to about 1 o'clock, when I heard the telephone ring; I answered the phone, and I heard what seemed to me, and I believe up to this minute that it was, Mrs. Guzzi, speaking through the phone. She spoke in a weak and trembling voice; it seemed like she had trouble or was in trouble some way or other. She asked me to come to her house that night, she wanted to see me on some important business. I did not know and she did not say what she wanted. She said, 'Come tonight, I want to see you on some important business.' I studied all through the afternoon, and could not make out what she wanted to see me for. At 6 o'clock I went and got supper and came back and took off the saw and took it to the corner to file it. After I filed the saw—I had a with-drawal card I got from the K. of P.; I filled out the blank and was going to put it in that night. I took my withdrawal card and went over to Broadway to catch a car and go up to the lodge, so I came up to Broad-way and there was no car in sight. The cars ran at that time, I believe, fifteen minutes apart; so I walked up Broadway, and I got away up Broadway before any car came; I concluded then I would not take a car. All the way along I was debating in my mind whether to go to lodge and put in my withdrawal card or go out to the Guzzi house. I was kind of leary of it, but I thought possibly there was something wrong; I did not know; the voice spoke in a way that seemed like they were in trouble, and I thought possibly if I went I might do Mrs. Guzzi some good some way or other; that she might want to ask me some questions some way or other, so I concluded to go up, so I went. The store was closed. I did not notice what time of night it was, so I knocked on the front door of the Guzzi house and no one answered. In the telephone message it said to come around to the side door if the store was closed. I knocked on the front door; no one answered; then I walked to the side door that was open there. The horse was standing out in the street under the electric light, and the bugs were flying around the light, which was over the street car track, like; I didn't know whose horse it was; didn't pay any attention to it, so I went to the side door, which was open. I could see it plainly where I was, and I stepped in; and as I stepped in—there are two doors, the one I stepped in leads into the stable, and it was then very dark inside. When I stepped inside I could hardly see the other door. When I stepped in I heard some-

body call out 'your horse is out.' Well, I stopped; I didn't know where to go. I stopped and I heard the voice again. Some moments passed, and so after that I looked out and saw the horse still there, so I stepped on in and stepped through the other door, and about the time I stepped through, the back door on the back part of the building there opened and Mr. Guzzi stepped out with a gun in his hand and commenced to fire on me; just the moment I stepped in, he fired on me; the first shot he fired just nipped my left ear, and the powder burned the left side of my face and in my left eye; he was so close on me that the shot almost stunned me, so I ran back, and aimed to go through; I ran towards the door and by the time I got to the door, he firing on me continually, and I saw it was my life or his—it was life or death right there—I was in there and could not get out; I saw I was decoyed or was in a trap set for me, and the only way to get out was to shoot my way out of there. I thought I was shot; my face was powder-burned and almost scalded; so I jerked out my gun to save my life; I thought I was shot and expected to fall any minute, and the only chance I had was to shoot for my life right then and there. He continued shooting at me and he was so close the blaze was right in my face, so I shot toward the fire. I recognized Mr. Guzzi plainly just a second before he fired; I saw him with the gun in his hand, and when I shot I didn't know whether he was down or anything. I shot in the direction of the fire; then I turned, and I don't know how I reached the gate, but I reached it and got away from there, but which way I went or how fast I went I don't know; don't think anybody would know who was in my fix. My face was all powder-burned; I was stunned and ready to fall and I don't know which way I went or how fast I went, but I first found myself out west of the place. Then I goes over to the rice mill, and goes up stairs. Ward and Jesse were up in the second story; the office was up in the second story. I goes up stairs, and before I gets to the door, I takes my gun and lays it on a sack of rice right beside the door, before I stepped in. I had a kind of silk green or greenish handkerchief tied over this eye. My eye was swollen and powder-burned; several grains of powder was in my eye. I had this handkerchief around the side of my face. My face was badly powder-burned and black. I goes up into the office and this fellow Ramon and Ward were sitting there, and I talked with Ward. I said, 'Ward, I have had some trouble; if any one asks you where I have been during these hours, tell them I was here at the mill.' My intention was then to prove an alibi; I was worried; I had been caught in a trap, and I thought the best I could do was to keep everything quiet; I didn't want to get Mrs. Guzzi into any trouble. I thought I would get to see her, so I thought it best to keep it quiet until I could see her, and see what was the reason they called me out there and trapped me. I did not then want to get Mrs. Guzzi in any trouble, and I didn't want to cause myself any trouble; I only had a small business and was a cripple, a

one-handed man (showing his hands to the jury, one of his hands being crippled), and I only had a few hundred dollars' worth of stuff. What I had, I had got by my own help, and I didn't want to get my friends into any trouble whatever, so I tried to keep the thing quiet that night. I then got Ramon to go with me over to a store and I got Ramon to shave me. My face felt sore and scalded and was all powder-burned on this side, and in my left eye, so he worked on me to get the powder out of my left eye, and from there I goes home and goes to bed. The next morning, about 6:30 or something like that, Ward and Ralph Johnson came over. They told me they were going down the island, and asked me to go along. I went; I had nothing else to do; I didn't know what on earth to do. * * * I took the gun, and went down the island, shooting at targets, with Ward and Ralph, and we got back at about 11 o'clock that morning. Ralph and I got out and unhitched the horse. I then saw some officers get off the car. Officer Bee, Curtin and Jordan. They waited until we got the horse unhitched and led him in, then they told me that the chief wanted to see me at the station. I asked them to wait until I went and ate my dinner, but they said no, to come on now; so I went down to the station. I wanted to see Mrs. Guzzi; I wanted to talk with her; I wanted to know how I came to get into this trap. I would rather be shot dead myself than to get her into any trouble, whatever. I told the officers the best I knew all about it. I do not remember telling them my face was black, which I did not; I denied that. I told them the best I knew how it was. I did not call out that night to Guzzi or to any one that any horse was out; I did not know whose horse it was that was out in the street. To tell the truth, I didn't know whether Guzzi had a horse or not. I am a single man. I did not see Ward and this man Ramon before the shooting at all. * * * To the best of my memory I signed the paper prepared by Mr. Royston or Mr. Curtin about 4 o'clock in the afternoon; don't remember whether it was on Sunday or on Monday. Mr. Curtin read some of said paper over to me; don't know whether he read it all over to me or not. Don't remember how many places he asked me to sign said paper. I did not have any handkerchief over my face at all before the shooting. After the shooting, while on my way back, I took a silk handkerchief with a greenish border and tied it over my eye, and also over the side of my face; my face felt like it was almost scalded. I tied the handkerchief over this eye, right back over the lower part of my ear; it looked like a bullet had grazed my ear; a little part of the skin was torn off the bottom part of my ear. I did not use any pistol nor did I attempt to fire on Guzzi before he fired on me; the first shot was fired by Guzzi. I drew my pistol a few seconds after I saw him, and he just had time to fire, when I turned to the door, and he followed me up in front with a pistol almost against me; he had a double-action gun, and I had a single-action; he could fire twice before I could shoot once; all I had to go by was the fire out of his gun, and he

was shooting right into my face. * * * It is not a fact that I was disguised. I had on a gray suit of clothes and probably the same collar I have on now, or a make of the same collar, and the same tie; I had on a high-standing collar and a black hat I wore all the time. I had the green handkerchief wrapped over this side of my face after I had been shot in the face; before that I had the handkerchief in my pocket; * * * I know Mr. Pierce. I did not send for Mr. Pierce that night. I did not tell Mr. Pierce how this thing occurred. I don't know anything about having Mr. Pierce summoned as a witness.. I did tell Mr. Pierce that Mrs. Guzzi had telephoned for me to come out. I don't hardly remember what I did say; I stated it the best I could as to what had happened; I was frightened badly, and hardly had my right mind. I was rattled; my face was all powder-burned and I was bothered about being in trouble, and my people were not here. I did not tell Mr. Pierce that Mrs. Guzzi called her husband down and that I shot him when he came down. I don't remember which way I went after I did the shooting; I remember I got away from there. I was frightened almost to death, and don't know which way I went, nor how fast I went; I only know I got away from there. I did not know but what some other person was laying for me, but I got away from there all right. I don't know where Mrs. Guzzi was when I shot Mr. Guzzi; I don't remember. I don't know whether the statement shown me is the statement of Mrs. Guzzi or not; don't remember whether I saw said statement or not. My intention was, when I got home, to prove an alibi. I did not tell Ward and the Mexican that they must state that I was at the mill on said night. I asked them if anyone asked where I was during that hour to tell them I was at the mill—it was my intention to prove an alibi; because I didn't want to have any trouble. I wanted to see Mrs. Guzzi and see why she had got me in a trap. I thought maybe that Guzzi had overheard her at the telephone, or had forced her to telephone me to come there. I wished to see Mrs. Guzzi before I got locked up. I didn't want to get any of my friends into trouble, as I had always been a law-abiding man, and never had got into any trouble, and always had lots of friends. * *. * The Mexican, Ramon, and I went over to my place. The Mexican is the one that worked for me. When I came back, the Mexican was over at Ward's place. I sent the Mexican over to Ward's place. I don't remember giving the Mexican any cartridges. I don't remember how long I stayed up after I came back to the mill, I suppose about an hour. He shaved me, and the Mexican picked the powder out of my eyes and worked with me a good while—there was powder in this corner of my eye and all the way back, and the skin was burned off my ear. I did not send for Mr. Pierce on said occasion, and don't remember that I had Mr. Pierce summoned as a witness. I remember having a conversation with Pierce, but don't remember whether it was on Sunday

morning or Monday morning—don't remember. I did not go hunting on said day; we were just shooting pistols at targets; Ward asked me to go down the island with them, and also Ralph Johnson asked me would I go down the island with them. Ralph Johnson did not stay at the mill, too. I am not much acquainted down the island, but we went a good ways down the island. I don't know what time we left to go down the island, but we got back at about 11:30; The balance of said day I stayed up in the police office. The conversation with the officers was on the same day I got back from the hunting; they took me down there; they said the chief wanted to see me. I told the officers to wait until I got my dinner. When I signed the statement in the police station, I did not read it. But Mr. Curtin wrote it and I signed it, where Curtin told me to sign it." Here the defendant rested his case.

In rebuttal, the State offered Leonardo Grilli, who testified: "I knew Vincent Guzzi in his lifetime; worked for him two years and three months; on the night of the killing of Guzzi I was sleeping next door; I heard shots on the night of the killing; could not state how many shots were fired, because they were fired so rapidly. I had nothing to do with calling Guzzi down before the shooting. None of Guzzi's relatives have tried to have me swear that Mrs. Guzzi killed her husband."

G. T. Pierce, for State, testified: "The defendant stated to me in the police station at the time heretofore named that Mrs. Guzzi telephoned for him, the defendant, to come down there, and that when he went down there, Mrs. Guzzi called Mr. Guzzi down; that he, the defendant, shot him (Guzzi)."

Defendant, Elijah Nicks, recalled in rebuttal, testified: "I did not make the statement which G. T. Pierce has just detailed on the witness stand. I signed the paper at the police station—whatever it was, I don't know. I did not send for Pierce at all. When the door of the chief's office would be open and they going out and coming in, I saw Pierce there three or four times standing around in the hall talking to the officers, and Mr. Curtin told me that Pierce wanted to see me. Mr. Pierce promised me, if I would make a statement, he would get Judge Cavin to defend me, and that he would sign my bond. I do not know what relation Judge Cavin has to the street railroad company."

*Marsene Johnson* and *Aubrey Fuller,* for appellant.—The court permitted State's witness M. H. Royston, assistant district attorney, over objections of defendant, to testify to conversations with and statements made by one Thomas Ward against defendant, it being shown that said Ward was dead, and had never testified in this cause in any court, and that said Ward and defendant were both under arrest at the time said statements were made; and this action of the court is assigned as error.

The court permitted State's witness M. H. Royston, over objections

of defendant, to testify to conversations with and statements made by Ramon Garcia against defendant, said Ramon Garcia not being called as a witness by the State, said Ramon Garcia being also under arrest with defendant at the time said statements were alleged to have been made against defendant; and this action of the court is assigned as error. Cline v. State, 36 Texas Crim. Rep., 320, and authorities therein cited; Bell v. State, 2 Texas Crim. App., 215, and cases there cited.

The court failed and refused to instruct the jury as to the law of manslaughter, said charge being necessary and being called for and being imperative, and being raised by the testimony of defendant, as well as by the testimony of the wife of deceased; and the failure and refusal of the court to so instruct the jury as to said offense is especially assigned as error. Franklin's case, 30 Texas Crim. App., 628; Neyland v. State, 13 Texas Crim. App., 536; McLaughlin's case, 10 Texas Crim. 340; Folk's case, 58 S. W. Rep., 98; Hall's case, 66 S. W. Rep., 783; Slaughter's case, 34 Texas Crim. Rep., 81; Sowell v. State, 32 Texas Crim. Rep., 482; Morgan's case, 34 Texas Crim. Rep., 222; Mundine v. State, 37 Texas Crim. Rep., 5; Franklin v. State, 34 Texas Crim. Rep., 286.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of forty years; hence this appeal.

Appellant made a motion for continuance on account of the absence of two witnesses. This was the second application for continuance, and the diligence used was not sufficient.

During the trial the State was permitted, over appellant's objections, to introduce in evidence what purports to be a statement of one Ward in the presence of defendant. The statement of said Ward was proven by Mart Royston, a witness for the State. It was shown that the declarant Ward, whose statement was reproduced, was dead, having died since the commission of the homicide; and that Royston was present in the police station, and defendant Nicks was also present, and that Ward made the statement to Royston. Looking through the bill of exceptions, it appears that the statement was what defendant told Ward shortly after the homicide, as to what he had to do with it. We quote this portion of the bill, as follows: "Ward said he was a night watchman at the rice mill, and at times looked out for the business for Nicks, in Nicks' woodyard; that he saw Nicks the afternoon before the shooting, and Nicks told him he was looking for a man who had been laying around Nicks' place of business; that Nicks told him he wanted to lay for the man, and that Nicks wanted him to send for a Mexican named Garcia or Jesse, who worked for Nicks; and that Ward agreed to and did send for this Mexican; that Ward said further, that

in a few moments, the Mexican came and brought the cartridges, and inquired about the whereabouts of Nicks; and also telephoned for Nicks to come over so he could see him about a car of wood that had been or was to be purchased; that after telephoning he hung up the receiver and walked out of the mill on to the sidewalk to meet him. That somebody stepped from behind a bush or telegraph pole, who had his face blackened; that he, Ward, stepped back, and inquired who it was; and that Nicks laughed, and that Ward then said, 'What in the hell are you doing here?' And that said Nicks then said he was going to lay for a man; that said Ward further said that he then talked with Nicks about the wood, when Nicks went off. That later on in the night he heard a whistle, and went around and at first did not see anything, but later he went down there and found Nicks at the wash basin, when Ward said to Nicks that he would hold a lamp for him to wash. But Nicks said it was not necessary. That Nicks said to Ward then, 'I didn't get the man. I couldn't find the fellow I was looking for.' That he had walked out there and shot his gun; that he, Nicks, asked him, Ward, to take the gun and clean it; and that Ward said he took the gun and put it in his pocket. That Nicks then asked for Jesse the Mexican, and Ward called him down; that Nicks then asked if anyone had inquired for him; and Ward said no. That Nicks then said to Ward, 'If they do, remember to say I was here at the mill from 12 o'clock, and that I then went over home and wrote a letter.' Ward said he repeated this question, and statement to the Mexican, Jesse, when he came down; and told them both that if anybody inquired for him, for them to say that he had been at the mill all night; that Ward said he did not hear of the murder till Nicks was washing something out of his eye. Ward had stated also that when he telephoned Nicks, and Nicks came over and stepped from behind the bush or pole, that he, Nicks, had some blackened cork on his face, and Nicks then said that that statement of Ward was not correct, that he had not blackened his face but that he had a green handkerchief tied over the upper part of his face." The court attaches to this bill the following: "The witness was only allowed to state the evidence of Ward made in the presence of defendant and for the purpose of contradicting him." The objections urged to this testimony were, that it was hearsay and incompetent; that said witness Ward was dead and any statement made by him could not be used as evidence against defendant. If the bill could be treated as agreed to by appellant—that is, as his statement or confession—then it might be admissible; but it is not stated that appellant agreed to it, except that he was present and did not object to any of said statement, except in the conclusion he declared that the statement of Ward that his face was blackened when he saw him that night was not correct; that he had a green handkerchief tied over the upper part of his face—unless, as stated above, the testimony could be considered as the statement of appellant himself or that by his silence, he made it his

statement—then it was not introducable. Even had the witness Ward testified to the facts and had since died, under the ruling in Cline v. State, 36 Texas Crim. Rep., 320, his testimony could not be reproduced, much less could the unsworn statement of deceased Ward be introduced against appellant. Furthermore, as showing that the evidence was not introduced as a statement agred to by appellant, the court distinctly says that he admitted it for the purpose of contradicting appellant. Evidently, appellant could not be contradicted by this character of evidence; that is, by the unsworn statement of Ward, who had since died.

Appellant's third bill attempts to raise the question as to the admissibility of appellant's statement made to the witness Royston. This bill is not complete, in that it does not show as a fact that appellant was under arrest at the time, and had not been warned. This is merely raised by an objection. If appellant was properly warned, as is shown by the court, although not exactly contemporaneous in point of time with the statement made, it was admissible.

An objection made to the testimony of the witness George Pierce, as contained in bill of exceptions number 4, does not appear to have been well taken.

Nor did the court err in refusing to permit appellant to show, on cross-examination of the witness Leonardo Rilli, that certain of the relatives of deceased had attempted to bribe him (witness) to poison the wife of said deceased Guzzi, to prevent her giving testimony in this case. If said witnesses had been placed on the stand against appellant, then this character of evidence might have been used to impeach him; otherwise the appellant was not connected with anything done by said witness since the homicide.

Appellant criticises that portion of the charge of the court predicated solely on appellant's testimony, which tended to raise the issue of self-defense. Appellant contends that that portion of said charge which required appellant to *actually* believe that the wife of deceased had sent for him on a lawful mission, and he went there on said mission to see her was error. This insistence is that the word "actually" laid too great a burden upon appellant. It occurs to us that the use of the word "reasonably" would have been better.

Appellant also criticises the charge of the court in a succeeding paragraph to the effect: "Defendant would have no right to go to the house of said Guzzi for any unlawful purpose, if you find from the evidence he did so, and there provoke an assault by said Guzzi, and with intent to kill him or do him some serious bodily injury; and after so doing, to shoot and kill him, the said Guzzi, that he would not be justifiable." If appellant went to the house of Guzzi, as there is some testimony on his part tending to show, to see his wife on some lawful mission, such as to see her in regard to a divorce suit, on her request, and he was set upon, and shot at by deceased, he would have a perfect right to defend

himself. However, if he went to the house of deceased for some purpose that was not lawful, as for the purpose of having carnal intercourse with her, then he would be a wrongdoer; and as we understand the authorities would not have the perfect right of self-defense. Franklin v. State, 30 Texas Crim. App., 628. The court should have given a clear charge setting forth these theories.

Appellant also excepted to the failure of the court to charge on manslaughter. As stated above, the evidence suggests a theory of the case to the effect that appellant may have gone to the house of deceased on the night in question in order to secure a clandestine meeting with deceased's wife. If on another trial this theory is presented, it would be the duty of the court to charge on manslaughter. Franklin's case, supra.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*